UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**Ismael CARO, Jr.,**<br>        Defendant. | Crim. No. 18-152 (KM)<br><br>**OPINION and ORDER** |

MCNULTY, J.

## I.   BACKGROUND

On March 27, 2018, the defendant, Ismael Caro, Jr., pled guilty to conspiracy to distribute 5 kilograms or more of cocaine and 1 kilogram or more of heroin, in violation of 21 U.S.C. § 846.[1] On October 25, 2018, this Court sentenced Mr. Caro to the statutory minimum sentence of 10 years' imprisonment, in accordance with the parties' plea agreement. While serving that sentence at FCI Mendota, he moved for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A), based on a heightened risk of severe harm should he be infected with COVID-19, because he suffers from the aggravating medical conditions of obesity and asthma. I denied that motion by opinion and order filed December 29, 2020. (DE 53)

Some two years later, on November 16, 2022, Mr. Caro again filed a motion for compassionate release based on the COVID-19 pandemic and his medical condition. (DE 54) By then, he had been transferred to FCI Victorville Medium II. The government filed a response, stating that administrative remedies had not been exhausted, but in the alternative responding on the merits. (DE 55) Because of the passage of time and the transfer to a new

---

[1]    The actual offense conduct encompassed 20 kilograms of narcotics, comprising 9.8 kilograms of cocaine, 7.9 kilograms of heroin, and 984 grams of a fentanyl equivalent.

1

institution, I entered an order denying the motion as presented and requiring that Mr. Caro again exhaust his administrative remedies before the Bureau of Prisons.[2] (DE 56) I ordered the government to report back on the status of administrative exhaustion and, after due inquiry, the U.S. Attorney's Office conceded that such an application had been filed and that there had been no BOP decision within 30 days, satisfying the exhaustion requirement. (DE 63) I endorsed an order on the government submission, stating that the motion would be heard based on the already-filed submissions. (*Id.*)

Mr. Caro's second motion for compassionate release (DE 54), then, is properly before the Court. For the reasons stated herein, it is denied.

## II.   DISCUSSION

The U.S. Court of Appeals for the Third Circuit has explicated the standards governing compassionate release under the First Step Act:

> The compassionate-release provision states that a district court "may reduce [a federal inmate's] term of imprisonment" and "impose a term of probation or supervised release … if it finds that … extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). [fn. 5 omitted] But before granting compassionate release, a district court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." Id. § 3582(c)(1)(A). [fn. 6: "The sentencing reduction must also be 'consistent with applicable policy statements issued by the Sentencing Commission.' 18 U.S.C. § 3582(c)(1)(A)."] Those factors include, among other things, "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, … to

---

[2]   The CARES Act has its own specialized exhaustion requirement. The power to file a compassionate release motion under section 3582(c)(1)(A) is lodged in the first instance with the Bureau of Prisons. Only after the BOP has denied the defendant's application, or after 30 days have elapsed without a decision by the BOP, can the defendant file a motion in court. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. Apr. 2, 2020) (denying remand of appeal seeking compassionate release as futile in light of lack of exhaustion).

2

provide just punishment for the offense[, and] ... to afford adequate deterrence to criminal conduct," id. § 3553(a)(2)(A)–(B).

*United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).

### 1. Consistency with Sentencing Commission policy statements

The Guidelines application note to § 1B1.13, *supra*, includes examples of medical conditions considered "extraordinary and compelling," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). More generally, it provides that such a condition would be satisfied by a defendant who is

> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.,* cmt. n.1(A). Categories (B) and (C) cite advanced age and family circumstances not relevant here. Finally, there is a catchall category (D):

> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Particularly in the context of the COVID-19 pandemic, however, the courts have not treated these categories as exclusive. Although useful as a guide, they do not confine the court's discretion with respect to a prisoner-initiated motion. *See United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021).

### 2. Extraordinary and compelling conditions

Generally speaking, the danger from the COVID-19 pandemic has plummeted since Mr. Caro filed his first compassionate release application over

3

two years ago. As of Monday, April 10, 2023, President Biden signed into law H.J. Resolution 7, which terminates the national emergency related to the COVID-19 pandemic. Any emergent application, then, sails into a headwind. Nevertheless, I consider whether conditions at FCI Victorville Medium II, viewed in the context of Mr. Caro's medical condition, set forth an extraordinary and compelling case for release.

### a. Obesity and asthma

Mr. Caro is 34 years old and, except as noted, is in generally good health. He asserts, however, that he has two medical conditions, obesity and asthma, which render him particularly vulnerable to serious harm should he become infected with COVID-19.

Obesity is a condition that places individuals at increased risk from COVID-19 infection. Here is the latest guidance from the CDC on body mass as a risk factor:

> Overweight (defined as a body mass index (BMI) is 25 kg/m2 or higher, but under 30 kg/m2), obesity (BMI is 30 kg/m2 or higher, but under 40 kg/m2), or severe obesity (BMI is 40 kg/m2 or higher), can make you more likely to get very sick from COVID-19. The risk of severe illness from COVID-19 increases sharply with higher BMI.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited April 25, 2023). Based on his reported height and weight, Mr. Caro's BMI remains in the "obesity" range. No significant improvement is noted since the Court's prior decision.

"Asthma, if it's moderate to severe" also appears in the CDC listings as one of the conditions that may place a person at increased risk. *Id.*[3] Mr. Caro states that his asthma has grown worse since his prior, denied compassionate release application. The records contain no explicit diagnosis of Mr. Caro's asthma as being moderate to severe; it is, however, surely genuine.

---

[3] The CDC guidelines for asthma are currently being updated. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html

A review of the most recent medical records confirms that Mr. Caro has received regular, appropriate care for his asthma. See Gov't Ex. B: BOP 2021-22 Medical Records; Gov't Ex. C: BOP 2020-21 Medical Records (all filed under seal at DE 55). He has been prescribed inhalers, but has been inconsistent about using them. Most recently, as of September 2022, it appears that he has complied with directions for use of a mometasone furoate inhaler. *Id.* at 2. He states that this inhaler suppresses his immune response, but offers no medical evidence to that effect. The government cites medical evidence that no such side effect has been observed. *See* Gov't Response 21 (citing e Drugs and Supplements: Momentasone (Nasal Route), Mayo Clinic, Asmanaex HFA 50 mcg, 100 mcg, 200 mcg (mometasone furoate) Inhalation Aerosol, at https://www.mayoclinic.org/drugs-supplements/mometasone-nasal-route/side-effects/drg-20064895?p=1 (Nov. 23, 2022); https://www.asmanex.com/asmanex-hfa (Nov. 23, 2022)).

An allergy to onion, associated with shortness of breath and vomiting, was noted. Benadryl was prescribed, and he was advised to avoid foods containing onion. (Gov't Ex. B at 2, 10; Ex. C at 2)

Mr. Caro's obesity rises to the level that CDC recognizes as creating a risk of severe consequences in the event of a COVID-19 infection. As to asthma, the level of severity is less clear, but at least one aggravating condition has been identified. I will assume that it falls at or near the level that increases the risk of severe consequences from COVID-19.

### b. Vaccination

Mr. Caro has repeatedly declined to be vaccinated against COVID-19. (Gov't Ex. B at 53, 70; Gov't Ex. C at 57, 71, 90) In connection with those refusals, notes on the chart record his objection that the institution "refuses to test med allergy." (Gov't Ex. C at 90).[4]

---

[4] His claim that staff advised him not to take the vaccine is not documented by any of the medical records.

5

This court and others, while not treating refusal to be vaccinated as disqualifying, have cast a skeptical eye on inmates who claimed to be in fear of their lives while forgoing obvious preventative measures. *See United States v. Thomas*, Nos. 21-1645 & 21-2105, 2022 WL 296594, *2 (3d Cir. Feb. 1, 2022)(unreported); *United States v. Johnson*, Crim. No. 18-578-01 (KM), 2022 WL 901468 *5-*6 (D.N.J. Mar. 28, 2022) (McNulty, J.) (discussing *Thomas*).

Here, however, we have more than a bare refusal. Mr. Caro does suffer from documented allergies, a medical history that may make him more cautious than the average person.

That said, there is no medical information suggesting that he is or would be allergic to the vaccine itself. He is, as noted, allergic to onion, but no medical evidence of a connection between that food allergy and adverse reactions to the vaccine is proffered. To the contrary, the government cites CDC advice that people with food allergies nevertheless be vaccinated: "You should get vaccinated if you have allergies that are not related to vaccines or injectable medications such as food, pet, venom, environmental, or latex allergies. People with a history of allergies to medications taken by mouth or a family history of severe allergic reactions can also get vaccinated." Getting Your COVID-19 Vaccine, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect.html at "If you have allergies not related to vaccines" (Nov. 23, 2022).

It is reasonable to question the Petitioner's weighing of speculative allergy-related harm against the well-documented, potentially fatal consequences of a COVID-19 infection, the fear of which underlies his request for immediate release from prison. Nevertheless, because Mr. Caro proffers at least a potential basis for his refusal to be vaccinated, I weigh it less heavily than I have done in other cases.[5]

---

[5]     I consider the vaccination of other inmates and the resulting herd immunity in the following section.

### c. Likelihood of infection at FCI Victorville Medium II

I next consider the risk of COVID-19 infection at FCI Victorville Medium II. Currently, that risk is very low, and there are currently zero positive test results among inmates or staff.

The FCI Victorville Medium II facility houses 1066 inmates, all male. https://www.bop.gov/locations/institutions/vvm/. Current statistics regarding COVID-19 cases at Victorville Medium II are as follows:

**COVID-19 Cases**

| Inmates positive | Staff positive | Inmate deaths | Staff deaths | Inmates recovered | Staff recovered |
|---|---|---|---|---|---|
| 0 | 0 | 2 | 0 | 533 | 93 |

https://www.bop.gov/coronavirus/[6] Currently, the institution is at BOP COVID-19 Operational Level 1, the lowest of the three levels, indicating a medical isolation rate < 2% and new community cases < 100 per 100,000. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp

The explanation may lie in the waning of the COVID-19 pandemic and widespread vaccination. As noted above, rates of transmission, hospitalizations and deaths have declined to the point that President Biden has called a halt to emergency measures in the community at large. Within the federal prison system, approximately 350,000 doses have been administered. At Victorville FCC, 506 full staff inoculations and 4499 full inmate inoculations have been completed. https://www.bop.gov/coronavirus/covid19_statistics.html.[7] Despite his voluntary unvaccinated status, then, Mr. Caro benefits greatly from the herd immunity of the inmate population; assuming he is vulnerable to

---

[6]   The "recovered" figures imply an outbreak or outbreaks in the past, however.

[7]   The figures given are for the Victorville federal correction complex, which comprises three facilities: FCI Victorville I, FCI Victorville II, and USP Victorville, which together house approximately 3875 inmates. The rate of inmate turnover is not stated. The percentage of inmates inoculated at FCI Victorville Medium II thus cannot be calculated precisely from the data on the BOP website; it can be stated with some confidence, however, that the percentage is high.

catching COVID-19, he has established no dramatic disparity in the likelihood of his encountering an infected person in or out of prison.

### 3. § 3553(a) Factors

I am next required to consider the foregoing in the context of the familiar sentencing factors of 18 U.S.C. § 3553(a), "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Here, I incorporate the analysis of my prior decision. (DE 53)

The only significantly altered factor is the percentage of the sentence that Mr. Caro has served. The expiration of his full 120-month term would occur on March 8, 2028. Taking into account 365 days of First Step Act credit and all other credits, his eligibility for home release is 3/15/2025, and his projected release date is 9/15/2025. (DE 55-1) He has served approximately 61 months: just over half of the time until expiration of his 120-month sentence, and about 2/3 of the time until his projected release date.

Even assuming extraordinary and compelling circumstances, which I have not found, I would not find that the passage of time or good conduct in prison are sufficient to alter the § 3553(a) balance.

## CONCLUSION

Mr. Caro suffers from chronic health problems, shared by many persons, that would plague him whether in or out of prison. To be sure, they would increase the likelihood of severe consequences if he should contract a COVID-19 infection. And, over the last three years, some inmates have been released because of the greater likelihood of becoming infected in an institutional setting. Currently, however, there are zero positive cases in Victorville Medium II, and there is no reason to believe that release to the community is compelled to ensure Mr. Caro's safety. The application for compassionate release, pursuant to the First Step Act, 18 U.S.C. § 3182(c)(1)(A), is denied.

## ORDER

Accordingly, for the reasons expressed above,

IT IS this 26th day of April, 2023

ORDERED that the motion (DE 58) to reinstate defendant's second motion for compassionate release based on proof of exhaustion of BOP remedies is GRANTED; and it is further

ORDERED that the defendant's second motion (DE 54) for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED.

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge